IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| A.C., individually and as Legal Guardian of P.M.,<br><br>      Plaintiff,<br><br>  vs.<br><br>DEPARTMENT OF EDUCATION, STATE OF HAWAIʻI, and KEITH T. HAYASHI, superintendent of the Hawaiʻi Public Schools,<br><br>      Defendants. | Civil No. 25-00228 MWJS-WRP<br><br>ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S MAY 2, 2025, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION |

**INTRODUCTION**

Plaintiff, A.C., is a father and legal guardian of a student with disabilities.  He

contends that his son was denied the free appropriate public education to which the

Individuals with Disabilities Education Act ("IDEA") entitles him.  But after a four-day

hearing, an Administrative Hearings Officer ("AHO") of the Hawaiʻi Office of Dispute

Resolution issued findings of fact, conclusions of law, and a decision ruling in favor of

Defendants, the Department of Education, State of Hawaiʻi ("DOE"), and Keith T.

Hayashi, the superintendent of the Hawaiʻi Public Schools.

In this appeal, A.C. seeks judicial review of the AHO's decision.  Having

carefully considered the parties' arguments and the record, the court concludes that the

AHO's decisions were correct and that A.C.'s appeal is not meritorious. The AHO's

decision is therefore AFFIRMED.

## BACKGROUND

### A.    IDEA Legal Framework

Under the IDEA, states that receive federal education funding—as the State of

Hawaiʻi does—are required to provide a free appropriate public education ("FAPE") to

every child with a disability. 20 U.S.C. § 1412(a)(1). The IDEA requires that "all

children with disabilities have available to them a [FAPE] that emphasizes special

education and related services designed to meet their unique needs and prepare them

for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

To that end, although the IDEA does not guarantee the "absolutely best or potential-

maximizing education," it requires schools to provide services that are "reasonably

calculated to enable a child to make progress appropriate in light of the child's

circumstances." *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010)

(cleaned up); *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

The FAPE "consists of educational instruction specially designed to meet the

unique needs" of the disabled child. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.,*

*Westchester Cnty. v. Rowley*, 458 U.S. 176, 188–89 (1982). It includes both "special

education and related services." 20 U.S.C. § 1401(9). And the principal mechanism

through which school districts provide a FAPE is the individualized education program

2

("IEP").  *See K.P. by & through S.K. v. Dep't of Educ.*, No. 22-CV-00267-DKW-WRP, 2023 WL 2930568, at *1 (D. Haw. Apr. 13, 2023).  The IEP is "the centerpiece of the statute's education delivery system for disabled children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).

Each student's IEP is prepared by an IEP team that includes teachers, school officials, and the child's parents.  20 U.S.C. § 1414(d)(1)(B).  Through the convening of annual meetings, the IEP team evaluates the student's progress and develops a written plan setting forth measurable goals and the special education and related services to be provided.  *See* 20 U.S.C. §§ 1401(9), (14); 1414(d); *see also L.B. By & Through Morrisey v. San Diego Unified Sch. Dist.*, No. 24-5543, 2026 WL 554455, at *8 (9th Cir. Feb. 27, 2026) (recognizing that the purpose of IEP team meetings is to "develop and offer an IEP constituting a FAPE to children with disabilities").  To qualify as a FAPE, the IEP must include a statement of goals, how the child's progress will be measured, and the special education and related services that the state will provide to the child.  *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1155 (9th Cir. 2024); *see also* 20 U.S.C. § 1414(d)(1)(A)(i).

Courts apply a two-part test to determine whether a school has provided a FAPE. At the first step, the question is whether the school has complied with the procedural requirements of the IDEA.  At the second, the inquiry is substantive, focusing on whether the IEP is reasonably calculated to enable the student to receive educational benefits.  *Rowley*, 458 U.S. at 206–07.  A state must satisfy both requirements to meet its obligations under the IDEA.  *Doug C. v. Hawaii Dep't of Education*, 720 F.3d 1038, 1043

3

(9th Cir. 2013); *Amanda J. ex. rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001).

But a failure to comply with the IDEA's procedural requirements—the inquiry at the first step—does not, by itself, constitute a denial of FAPE. *Amanda J.*, 267 F.3d at 892. Rather, if a procedural violation is established, the court must determine whether the violation (1) resulted in a loss of educational opportunity, (2) significantly impeded the parent's opportunity to participate in the decision-making process, or (3) caused a deprivation of educational benefits. *Id.* That is to say, "[h]armless procedural errors do not constitute a denial of FAPE." *Doug C.*, 720 F.3d at 1043.

When parents believe their child has been denied a FAPE, the IDEA allows them to challenge a school district's actions. A parent may file a due process complaint that is resolved through an administrative hearing. *See* 20 U.S.C. § 1415(b)(6), (f)(1)(A). A party aggrieved by the administrative decision may then appeal by "bring[ing] a civil action with respect to the complaint presented . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A).

### B.    Factual Background

#### 1.    P.M. Resides with a Caregiver from MAC

A.C.'s son is P.M., a student eligible for special education and related services under the IDEA. P.M. has been diagnosed with autism spectrum disorder and exhibits deficits in academic functioning, communication, social interaction, and behavioral

regulation.  These challenges affect P.M.'s ability to work toward grade-level standards and require specialized instruction and related services.

P.M. resides on Maui, and his assigned public "home school" within the DOE is Baldwin High School.  P.M.'s father, A.C., holds an educational power of attorney authorizing him to make educational decisions on P.M.'s behalf.  But A.C. does not live with P.M.  Instead, because of P.M.'s disabilities, he resides with a caregiver who has cared for P.M. for several years.  The caregiver has been employed by Maui Achievement Center ("MAC") as a registered behavior technician ("RBT") and operations manager.

MAC is a private program that provides educational and Applied Behavior Analysis ("ABA") services to people with special needs.  P.M. began attending MAC when he was seven years old and, over time, has alternated between MAC and public schools operated by DOE.  In some prior years, DOE funded certain services provided to P.M. at MAC.

The events at issue in this appeal arise from the development and revision of P.M.'s IEP in August 2024.  But because events that occurred in March 2024 and in the months leading up to August 2024 are also relevant, the court describes them first.

### 2.    The March 2024 IEP Meeting and Fallout

DOE convened an annual IEP meeting for P.M. over several sessions in March 2024. A.C., P.M., and the caregiver participated in the meetings, and a representative

from MAC attended portions of the discussion.  The meeting resulted in an annual IEP dated March 15, 2024 (the "March 2024 IEP").  *See* Dkt. No. 10-1, at PageID.307-74.

P.M.'s March 2024 IEP included twenty-one annual goals addressing both academic and behavioral needs.  Several of those goals focused on reducing behaviors such as precursor behaviors, elopement, aggression, property destruction, and throwing items, while also promoting independence and safe participation in transportation.  *Id*.

The IEP provided for specialized instruction, speech-language therapy, occupational therapy, transportation services, and behavioral supports.  These supports included ABA services, individual instructional support from an ABA paraprofessional, and implementation of a behavior intervention plan ("BIP").  The plan also included supplementary supports such as sensory breaks, visual supports, and communication supports.

Following the March 2024 IEP meeting, the team developed a transition plan to guide P.M.'s transition from MAC to his public school, Baldwin High School.  Dkt. No. 12-58, at PageID.1020-21.  The transition plan contemplated a gradual process in which MAC personnel would initially assist P.M. while DOE staff developed familiarity with his needs.  During this transition period, MAC personnel assisted with transporting P.M. to school while the team worked toward shifting those responsibilities to DOE staff.  P.M. attended Baldwin High School for a period of time under this transition plan with support from MAC personnel.

6

On July 9, 2024, however, MAC suspended its transportation services after DOE did not extend its contract for those services.  The following day, July 10, 2024, P.M. stopped attending Baldwin High School.  And on July 11, 2024, P.M.'s father filed a due process complaint alleging that the March 2024 IEP denied P.M. a FAPE.

An AHO heard this first complaint and ultimately ruled that Defendants did indeed violate the IDEA by failing to provide transportation or transition services for that period between July and August 2024.  Dkt. No. 9-11, at PageID.136.  But the AHO "decline[d] to award tuition for an entire school year due to a denial of FAPE for approximately two weeks of [extended school year] and three weeks of school." *Id.* at PageID.141.  Instead, the AHO ordered compensatory educational services:  "seven thousand six hundred thirty-eight (7,638) minutes of IIS services; eight (8) hours of ABA or board-certified behavior analyst services; one hundred (100) minutes of occupational therapy services; and five hundred forty (540) minutes of speech-language therapy services.  All the compensatory educational services will be available to Student until September 29, 2028—six (6) months after Student turns twenty-two (22) years old." Dkt. No. 9-24, at PageID.285.

### 3.    The August 2024 IEP Meeting and Fallout

Around the time that A.C. filed his first due process complaint stemming from the July 2024 suspension of MAC's transportation services, A.C. also canceled a previously scheduled IEP meeting and informed DOE that he wished to reschedule the

meeting so that his legal counsel could attend. *See* Dkt. No. 12-9, at PageID.805. But DOE continued attempting to schedule a revision IEP meeting to discuss P.M.'s educational program and transition back to Baldwin High School. And after further communications between the parties, DOE convened a revision IEP meeting on August 22, 2024.

Participants in the August 22, 2024, meeting included A.C.; A.C.'s legal counsel; DOE personnel, Mr. Bradford Chun and Ms. Hsin-Ya Tribbey; and members of the school team. No representative from MAC attended the meeting, and neither A.C. nor his counsel requested that MAC personnel be invited. During the meeting, A.C.'s counsel informed the team that he would speak on the father's behalf, and the record reflects that counsel actively participated in the discussion.

The IEP team discussed P.M.'s potential transition back to Baldwin High School, including transportation arrangements and strategies to support P.M.'s adjustment to the school environment. One topic of discussion involved transitioning from the caregiver privately transporting P.M. to the use of DOE transportation (a school bus) with individual instructional support from a DOE RBT.

The team also discussed P.M.'s behavior intervention plan. The discussion included the behaviors targeted for reduction—such as precursor behaviors, elopement, aggression, throwing items, and property destruction—as well as the interventions used to address those behaviors and the process for modifying behavioral supports.

8

The meeting resulted in a revised IEP dated August 22, 2024 (the "August 2024 IEP").  The revised IEP retained the same annual goals as the earlier plan and continued to provide similar services and behavioral supports, with minor adjustments to certain service minutes.  The IEP also clarified that individual instructional support would extend to transportation services so that the BIP could be implemented during transportation between P.M.'s residence and Baldwin High School.

At the conclusion of the meeting, counsel for A.C. rejected DOE's proposed IEP offer and informed the team that A.C. intended to place P.M. in a private program and seek tuition reimbursement, rather than continuing discussion of DOE's proposed services.  Dkt. No. 11, at PageID.624-25.  And on August 23, 2024—the day after the IEP meeting—A.C. signed a contract enrolling P.M. at MAC for the upcoming school year and filed a new due process complaint challenging the August 22, 2024 IEP.  This new complaint (the "August 2024 Complaint") alleged that the DOE had denied P.M. a FAPE under the IDEA.  Dkt. No. 9-24, at PageID.271.

P.M. attended MAC until December 31, 2024, after which he was disenrolled for nonpayment of fees.  Dkt. No. 36, at PageID.1882.  The tuition at MAC for September 1, 2024, to December 31, 2024, amounted to $100,947.09.  Dkt. No. 9-24, at PageID.286.

### C.    Administrative Proceedings

The August 2024 Complaint alleged that P.M. had been denied a FAPE for three reasons:  first, that DOE had failed to invite and involve MAC to the August 22, 2024,

9

IEP meeting, which resulted in lost educational opportunity; second, that there had been a failure to discuss P.M.'s continued need for a transition support, especially when determining how P.M. could return to Baldwin High School; and third, that the August 22 IEP meeting had not included discussion of P.M.'s BIP.  Dkt. No. 9-24, at PageID.271.  The complaint requested, among other things, that the AHO find P.M. had been denied a FAPE for the reasons alleged and order the DOE to fund or reimburse A.C. for private educational services after August 22, 2024.

Following briefing, a four-day due process hearing was conducted by videoconference in January 2025.  *See* Dkt. Nos. 13-16.  Witnesses included A.C., representatives from MAC, and DOE personnel.  After considering the evidence and the parties' briefing, the AHO issued findings of fact ("FOF"), conclusions of law, and a decision resolving the claims.  *See* Dkt. No. 9-24.  The AHO concluded that A.C. (along with P.M., as the petitioners in that proceeding) had not met the burden of establishing that the August 22, 2024, IEP denied P.M. a FAPE on any of the three asserted grounds.

As to the first issue—concerning the absence of MAC personnel from the August 22, 2024, IEP meeting—the AHO concluded that MAC staff were not mandatory participants under 34 C.F.R. § 300.321, the IDEA's implementing regulations governing IEP team composition.  The AHO explained that, although a representative from MAC "may be included in the 8/22/2024 IEP meeting if Parent or DOE had invited him/her," "no one did."  Dkt. No. 9-24, at PageID.290.  The AHO further concluded that "[i]t

10

would not be reasonable to penalize DOE for not knowing that Parent wanted a representative from [MAC] at the 8/22/2024 IEP meeting when Parent did not express such a desire to DOE." *Id.* at PageID.290–91. Although A.C. and P.M. had argued that MAC representatives were required participants under the Ninth Circuit's decision in *Doug C.*, 720 F.3d 1038, the AHO rejected their argument, concluding that *Doug C.* did not stand for the proposition "that a representative from a private school is mandatory at an IEP meeting." *Id*. at PageID.290–91. The AHO therefore concluded that "Petitioners fail[ed] to meet their burden of proof with respect to this issue." *Id*. at PageID.291.

On the second issue—the alleged failure to discuss transition-related supports at the August 22, 2024 IEP meeting—the AHO understood A.C. and P.M.'s claim to be that DOE "failed to discuss" the transition-plan services previously provided by MAC and "did not address whether these services were still necessary, nor did it discuss the impact of their sudden cessation." *Id*. at PageID.291–92. The AHO concluded that A.C. and P.M. had "fail[ed] to meet their burden in showing that the 8/22/2024 IEP team failed to discuss transition supports to address Student's needs associated with transitioning from a private school setting to a public-school setting." *Id*. at PageID.292. In reaching that conclusion, the AHO reasoned that a transition plan from a private placement to a public-school program did not have to be included in the IEP, that DOE later addressed the issue at a separate meeting, and that addressing transition services

11

separately "would at most constitute a procedural violation." *Id*. at PageID.294. The

AHO further concluded that A.C. had not shown that any such procedural violation

"resulted in lost educational opportunity or significantly infringed upon Parent's

participation rights." *Id*. The AHO therefore found that A.C. and P.M. had "fail[ed] to

meet their burden in showing that Student was denied a FAPE when the 8/22/2024 IEP

team did not discuss Student's transition needs to transfer from Private Center to Home

School." *Id*. at PageID.295.

Turning to the third issue, concerning behavior interventions and P.M.'s BIP, the

AHO concluded that A.C. and P.M. had not shown a procedural violation because "the

IEP team discussed [P.M.'s] behavioral needs and behavioral interventions during the

8/22/2024 IEP meeting." *Id*. at PageID.295. The AHO specifically found that the

meeting discussion included "[P.M.'s] BIP, including the six (6) behaviors . . . that are

targeted for reduction in the BIP; interventions that are effective with [P.M.]; a crisis

plan in [P.M.'s] BIP; and the general process to change a BIP and the interventions in the

BIP." *Id*. The AHO further concluded that, "[e]ven assuming that the discussion about

behavioral interventions was deficient in some way, Petitioners fail[ed] to show that the

procedural violation significantly impeded [A.C.'s] opportunity to participate in the

decision-making process or deprived [P.M.] of an educational opportunity or benefit."

*Id*. at PageID.296. The AHO also addressed A.C. and P.M.'s argument that the BIP

needed to be included in the IEP itself, concluding that the issue had not been properly

12

raised in the due process complaint and that, in any event, "the IDEA does not require the incorporation of a BIP into an IEP." *Id*. at PageID.296–97.  The AHO ultimately found that "Petitioners fail[ed] to meet their burden in showing that the IEP team failed to discuss behavioral interventions and/or review Student's BIP during the 8/22/2024 IEP meeting." *Id*. at PageID.298.

Based on these factual and legal conclusions, the AHO determined that A.C. and P.M. had not met their burden of proving that DOE denied P.M. a FAPE and therefore denied the requested relief.  *See id*. at PageID.298–99.  The AHO further explained that, although P.M. had previously been awarded compensatory services for an earlier period when he was not attending school, A.C. was not entitled to reimbursement for the substantially larger cost of private placement sought here, particularly when P.M. unilaterally enrolled P.M. in MAC without affording DOE an opportunity to address the alleged deficiencies.  *Id*. at PageID.299.  The AHO therefore declined to award reimbursement or placement relief and instead identified, in the event a violation were found, a more limited remedy of reconvening the IEP team to address the disputed issues.  *Id*. at PageID.300.

A.C. now brings this appeal, individually and as legal guardian of P.M.  Neither party requested evidentiary supplementation of the administrative record, but the court held a hearing on the appeal on March 10, 2026, at which it heard arguments from counsel.  Dkt. No. 43.

## STANDARD OF REVIEW

Under the IDEA, the role of the reviewing court differs from the ordinary framework applied in judicial review of agency action.  Federal courts accord "considerably less deference to state administrative proceedings than they do in most instances of judicial review of agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053 (9th Cir. 2012) (cleaned up).  The statute authorizes courts reviewing IDEA decisions to "hear evidence that goes beyond the scope of the administrative record and, based on a preponderance of the evidence, grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); *Anchorage Sch. Dist.*, 689 F.3d at 1053.

The IDEA provides that, when reviewing a decision issued after a due process hearing, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  At the same time, the Supreme Court has cautioned that the requirement that a reviewing court base its decision on a "preponderance of the evidence" does not invite courts "to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  Instead, courts must give "due weight" to the administrative

14

proceedings.  *Id.*; *see also L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009).

A reviewing court must carefully consider the administrative findings and "endeavor to respond to the hearing officer's resolution of each material issue." *L.M.*, 556 F.3d at 908 (cleaned up).  Although the court ultimately determines the amount of weight to assign to the administrative decision, it may not simply disregard those findings. *Id.*  Greater deference is warranted where the administrative findings are "thorough and careful." *Id.* (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)).  A hearings officer's decision merits such deference when it "evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438–39 (9th Cir. 2010) (quoting *County of San Diego v. Cal. Special Educ. Hearing Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996)) (alterations in original).

Finally, the burden of proof in an IDEA appeal rests with the party challenging the administrative decision.  *See Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007).

## DISCUSSION

In this appeal, A.C. contends that Defendants failed to provide P.M. a FAPE for the same three reasons raised before the AHO.  First, he argues that Defendants violated

the IDEA by failing to invite personnel from MAC to the August 22, 2024, IEP meeting, and he argues both that Defendants were required to do so, and that the absence of MAC personnel meaningfully interfered with parental participation.  Second, he contends that Defendants denied P.M. a FAPE because the IEP team did not discuss transition services in the August 22, 2024, IEP meeting.  Third, A.C. contends that Defendants violated IDEA because they did not incorporate a behavior intervention plan directly into P.M.'s IEP.  And given these alleged violations of the IDEA, A.C. contends that Defendants should be required to reimburse the tuition owed for P.M.'s attendance at MAC in the Fall of 2024.  The court considers each of these arguments in turn.

### A.    MAC Was Not a Mandatory Meeting Participant

A.C. first contends that the DOE denied P.M. a FAPE by failing to include personnel from MAC, P.M.'s private service provider, in the August 22, 2024, IEP meeting.  Dkt. No. 36, at PageID.1871-75.  He argues that this omission ran afoul of the Ninth Circuit's decision in *Doug C.*, 720 F.3d 1038, because MAC personnel allegedly possessed the most current information regarding P.M.'s behaviors and needs.  Dkt. No. 36, at PageID.1872.  A.C. further contends that, under *Doug C.*, this alleged violation does not require a showing of resulting harm; in A.C.'s view, the absence of MAC personnel is itself sufficient to establish a denial of FAPE, without regard to whether it resulted in any loss of educational opportunity or impaired parental participation.  A.C.

16

characterizes it as a "per se" violation of the IDEA—akin to a structural error in criminal procedure.

Although the IDEA itself does not specify which individuals must attend an IEP meeting, regulations promulgated by the U.S. Department of Education do just that, and all parties here accept that those regulations are lawful. *See* 34 C.F.R. § 300.321. These governing regulations do not support A.C.'s argument.

The regulations create two categories of participants in IEP team meetings. The first are mandatory participants, whom the public agency must include in all cases. These are: the child's parents, *id.* § 300.321(a)(1); at least one regular education teacher, *id.* § 300.321(a)(2); at least one special education teacher or provider, *id.* § 300.321(a)(3); a representative of the public agency, *id.* § 300.321(a)(4); and an individual who can interpret the instructional implications of evaluation results, *id.* § 300.321(a)(5). In addition, the child must be included "whenever appropriate" to do so. *Id.* § 300.321(a)(7).

The regulations then identify a separate, discretionary category of participants. They provide that "[a]t the discretion of the parent or the agency"—that is, not always or automatically—the school must include "other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate." *Id.* § 300.321(a)(6). The regulations further clarify that "[t]he determination of the knowledge or special expertise of any individual described in

17

paragraph (a)(6) of this section must be made by the party (parents or public agency) who invited the individual to be a member of the IEP Team." *Id*. § 300.321(c).

In short, the regulations establish two distinct categories:  mandatory participants, whom the public agency must include, and discretionary participants, who must be included only if the parent or the agency elects to invite them.  By the  plain language of the regulations, individuals with "knowledge or special expertise"—including "related services personnel"—must be included only "[a]t the discretion of the parent or the agency."  *Id*. § 300.321(a)(6).  In other words, individuals in that second category become a required part of the IEP team only if either the parent or the agency exercises that discretion to invite them.

A.C. does not argue that MAC personnel fall within any of the mandatory categories identified in § 300.321(a)(1)–(5), and nothing in the record would support such a conclusion.  Rather, MAC personnel would fall, if anywhere, within the discretionary category described in § 300.321(a)(6).  It is undisputed, however, that neither A.C. nor the DOE exercised their discretion to invite MAC personnel to the August 22, 2024 IEP meeting.  *See* Dkt. No. 9-24, at PageID.289–90 (citing FOF 40–44).  Under the plain language of the regulation, that is dispositive:  when no party elects to include a discretionary participant, the IDEA does not require the agency to do so on its own initiative.

18

The AHO reached the same conclusion, finding that MAC personnel were not mandatory members of the IEP team and that "a representative from Private Center may be included in the 8/22/2024 IEP meeting if Parent or DOE had invited him/her," but that "no one did." *Id*. at PageID.290. The AHO further concluded that "[i]t would not be reasonable to penalize DOE for not knowing that Parent wanted a representative from Private Center at the 8/22/2024 IEP meeting when Parent did not express such a desire to DOE." *Id*. The court agrees with that reasoning.

A.C. nevertheless contends that the Ninth Circuit's decision in *Doug C.* requires a different conclusion. He argues that *Doug C.* establishes that the absence of MAC personnel constitutes a "per se" violation of the IDEA under the circumstances of this case, such that no showing of harm is required. Dkt. No. 36, at PageID.1870. That argument does not rest on a correct reading of *Doug C.* In that case, the school district proceeded with an IEP meeting without the student's parent, despite the parent's request to reschedule, and finalized the IEP in the parent's absence. *Doug C.*, 720 F.3d at 1041-42. The Ninth Circuit held that this violated the IDEA because the statute places central importance on parental participation in the IEP process. *Id*. at 1044–47. And as detailed in the regulations discussed above, a parent is a mandatory participant of an IEP team.

But A.C. points to a passage in *Doug C.* in which the Ninth Circuit discussed the absence of personnel from Horizons Academy, the private placement of the student in

19

that case.  *See* Dkt. No. 36, at PageID.1874-75 (citing *Doug C.*, 720 F.3d at 1046-47).  A.C. contends that through this discussion, the Ninth Circuit created an additional requirement—beyond the text of the governing regulations—for a school to invite third party service providers whenever those providers have valuable information about the student.  This argument reads *Doug C.* too broadly.  As the AHO correctly explained, the Ninth Circuit cited the absence of Horizons Academy staff in *Doug C.* merely to underscore that the IEP team lacked critical information because neither the parent nor the private placement was present.  Dkt. No. 9-24, at PageID.291.  In other words, the reference to Horizons Academy highlighted the consequences of proceeding without parental participation—it did not create an independent requirement that knowledgeable third party service providers must be included in every IEP meeting. *See Doug C.*, 720 F.3d at 1047.

Nor does anything in *Doug C.* suggest that the absence of a discretionary participant—such as a private service provider—constitutes a categorical or "per se" violation of the IDEA.  To the contrary, the Ninth Circuit observed that procedural violations result in a denial of FAPE only if they "result in the loss of educational opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation process."  *Id*. at 1043.  As the Ninth Circuit recognized, "[h]armless procedural errors do not constitute a denial of FAPE."  *Id*.

20

And on the existing record, A.C. has not shown that the decision not to include

MAC—which was not only DOE's, but also his own—was anything other than harmless

error.  After all, P.M.'s father attended the August 22, 2024 IEP meeting, was

represented by counsel, and participated in the development of the IEP.  *See* Dkt. No. 9-

24, at PageID.279; Dkt. No. 11, at PageID.500–625.  The concern animating *Doug C.*—that

the school district in that case proceeded without parental participation—is therefore

not present here.  Put differently, even if the absence of MAC personnel could be

characterized as a procedural defect, A.C. has not shown that it resulted in a loss of

educational opportunity or significantly impeded his participation in the IEP process.

*See Doug C.*, 720 F.3d at 1043.  In any event, because the governing regulations did not

require DOE to include MAC personnel in the IEP meeting, A.C. has not established a

procedural violation in the first instance.

Accordingly, the court concludes that the AHO did not err in determining that

A.C. failed to establish a denial of FAPE based on the absence of MAC personnel from

the August 22, 2024, IEP meeting.

**B.      Defendants Adequately Discussed Transition Services**

A.C. next contends that DOE denied P.M. a FAPE because the IEP team did not

discuss, during the August 22, 2024 IEP meeting, whether services previously provided

by MAC—particularly transportation—were necessary to support P.M.'s return to

Baldwin High School.  Dkt. No. 36, at PageID.1876–79.  Although A.C. frames this

argument in terms of "transition services," the substance of the claim is that certain

supports had previously been necessary for P.M. to access his education at Baldwin and

therefore should have been considered and included in the IEP.  The AHO rejected this

argument.

In doing so, the AHO first concluded, as a matter of law, that neither the IDEA

nor Hawai'i law requires an IEP to include a transition plan when a student moves from

a private placement to a public school.  *See* Dkt. No. 9-24, at PageID.292–93 (citing

H.A.R. § 8-60-44(a); 20 U.S.C. § 1414(d)(1)(A)).  But the AHO also made a second,

independent finding:  that as a matter of fact, DOE *did* adequately address P.M.'s

transition-related needs, in part at the August 22 IEP meeting and in part at a

subsequent meeting.  The AHO found, in other words, that even if the full discussion

should have occurred at the August 22 IEP meeting itself, A.C. failed to show that the

alleged violation resulted in lost educational opportunity or significantly impeded his

participation.  *Id*. at PageID.294–95.

The court agrees with the AHO's second rationale, which provides a sufficient

basis to resolve this issue.  Under *Rowley*, the question is whether DOE complied with

the procedural requirements of the IDEA and, if not, whether any procedural deficiency

resulted in the denial of a FAPE.  458 U.S. at 206–07.  Even assuming that the IEP team

should have fully discussed, at the August 22 meeting, whether services previously

22

provided by MAC—including transportation—remained necessary for P.M. to attend

Baldwin High School, any failure to do so did not result in a denial of FAPE.

The AHO found, and the record reflects, that the IEP team *did* address aspects of

P.M.'s return to school during the August 22 meeting:  the team discussed transitioning

P.M.'s transportation from the Caregiver to an RBT who would ride the bus with P.M.;

they also discussed P.M.'s past experiences and behaviors while riding transportation,

and his future goals of riding the bus.  *See* Dkt. No. 9-24, at PageID.280 (FOF 47).

Although the parties dispute whether that discussion was sufficient, the AHO found

that adequate further discussion occurred after the August 22 meeting.  *See id*. at

PageID.294-95.  The AHO further found that DOE made reasonable efforts to convene a

transition meeting and that any delay in addressing those issues did not result in lost

educational opportunity or significantly interfere with A.C.'s ability to participate in the

decision-making process.  *Id*.  And, as the AHO noted, P.M.'s transition plan ultimately

was revised on October 28, 2024.  *Id*. at. PageID.294.  These findings are amply

supported by the record.

As discussed above, a procedural violation results in a denial of FAPE only if it

"result[s] in the loss of educational opportunity or seriously infringe[s] the parents'

opportunity to participate in the IEP formulation process."  *Doug C*., 720 F.3d at 1043.

The AHO concluded that A.C. failed to make that showing here, and the court finds no

error in that determination.  A.C.'s effort to characterize the omitted discussion as

23

involving "supplementary aids and services" does not alter this analysis. Even if the services at issue were necessary for P.M. to access his education, the dispositive question remains whether the timing of the discussion—rather than its absence altogether—caused the type of harm required under *Doug C*. And on this record, it did not.

For these reasons, the court concludes that the AHO did not err in determining that A.C. failed to establish a denial of FAPE based on the alleged failure to discuss transition-related services during the August 22, 2024 IEP meeting.

### C.   Defendants Adequate Discussed P.M.'s Behavior Intervention Plan

A.C.'s next argument is that the DOE denied P.M. a FAPE by "deferring" behavioral interventions to a behavior plan outside the IEP process and that the IEP team did not adequately discuss P.M.'s behavioral interventions during the August 22 meeting. Dkt. No. 36, at PageID.1879-81. According to A.C., the IEP team was required to incorporate P.M.'s BIP—which identifies behavioral goals and interventions designed to address P.M.'s behavioral needs—directly into the IEP rather than referencing the BIP as a separate document. *See id*. at PageID.1879–80. A.C. contends that because the BIP was not physically incorporated into the IEP, the IEP failed to state with sufficient clarity the services the DOE would provide.

A.C.'s argument thus proceeds on two related theories: first, that the BIP was required to be physically incorporated into the IEP; and second, that the IEP team failed

24

to adequately consider or discuss behavioral interventions at the meeting itself.  The

AHO rejected both arguments, and the court agrees.

With respect to the first theory, A.C. relies primarily on *M.C. v. Antelope Valley

Union High School District*, 858 F.3d 1189 (9th Cir. 2017), to argue that an IEP must

clearly specify all services the school district will provide and that referencing a

separate document renders the IEP unenforceable.  But the circumstances here more

closely resemble those addressed in *E.W. v. Hawaiʻi Department of Education*, in which

the Ninth Circuit held that the failure to include a BIP within the text of the IEP did not

deny the student a FAPE.  2024 WL 3102040, at *2 (9th Cir. June 24, 2024).  In other

words, the question is not whether the BIP appeared verbatim in the IEP document, but

whether the IEP team considered P.M.'s behavioral needs and included appropriate

behavioral supports.  The AHO concluded that it did, and the court sees no error in that

conclusion.

As the AHO found, the record reflects that the IEP team discussed P.M.'s

behavioral needs and the BIP in detail during the August 22, 2024 meeting.  *See* Dkt. No.

11, at PageID.610.  And the AHO also found that the team discussed the specific

behaviors targeted in the BIP—including precursor behaviors, elopement, physical

aggression, throwing items, property damage, and screaming—as well as interventions

that had proven effective for P.M., the crisis plan contained in the BIP, and the general

process for modifying the BIP and its interventions.  Dkt. No. 9-24, at PageID.280 (FOF

48).

The AHO further found that, at the time of the meeting, the behavioral goals and

interventions contained in the BIP were appropriate to meet P.M.'s needs.  *Id.*, (FOF 49).

Those same behavioral goals—including spontaneous "mands," independently

choosing alternative reinforcers, requesting breaks, gaining staff or peer attention, and

reducing precursor behaviors, elopement, physical aggression, property destruction,

and throwing items—were also incorporated into P.M.'s August 22, 2024 IEP.  *Id.* (FOF

50).

The AHO also addressed Plaintiff's related contention that the discussion of

behavioral interventions was inadequate.  Even assuming that "the discussion about

behavioral interventions was deficient in some way," the AHO concluded that A.C.

"fail[ed] to show that the procedural violation significantly impeded Parent's

opportunity to participate in the decision-making process or deprived Student of an

educational opportunity or benefit."  *Id.* at PageID.295–96.  The court agrees with that

reasoning.  As explained above, a procedural deficiency results in a denial of FAPE only

if it causes the type of harm identified in *Doug C.*  720 F.3d at 1043.  On this record, A.C.

has not made that showing.

A.C. nonetheless appears to contend that the BIP itself was required to be

physically incorporated into the IEP, because otherwise, it could be changed without

26

parental participation. *See* Dkt. No. 36, at PageID. 1881 ("The collaborative IEP process Congress mandated is undermined when critical supports can be altered without convening the team."). But Ninth Circuit precedent establishes that even a BIP cannot be altered without parental participation. *See E.W.*, 2024 WL 3102040, at *1. And neither the IDEA nor its implementing regulations impose a requirement that a BIP be physically integrated into a student's IEP. The IDEA requires IEP teams to consider the use of positive behavioral interventions and supports when a child's behavior impedes learning. *See* 20 U.S.C. § 1414(d)(3)(B)(i). It does not require that a BIP be embedded within the IEP document itself. *See* H.A.R. § 8-60-44; 34 C.F.R. § 300.320.

Nor does *M.C.*—upon which A.C. relies—compel a different result. In *M.C.*, the Ninth Circuit addressed a situation in which the student's IEP failed to specify a particular device or service that the student required, thereby preventing parents from knowing what services the school district would provide. 858 F.3d at 1198–99. That concern is not present here. The IEP expressly referenced P.M.'s BIP and incorporated behavioral goals and supports addressing P.M.'s needs. *See* Dkt. No. 9-24, at PageID.280 (FOF 48–50). In *E.W.*, the Ninth Circuit affirmed that referencing a BIP rather than incorporating it into the IEP did not deny the student a FAPE. 2024 WL 3102040, at *2. As in *E.W.*, the record here shows that the parent, A.C., participated in discussions concerning behavioral supports and that the IEP addressed the student's behavioral needs through goals, supports, and services. A.C. attended the August 22,

27

2024, IEP meeting with counsel, participated in the discussion of P.M.'s behavioral needs, and was not prevented from asking questions or providing input.  Dkt. No. 9-24, at PageID.296.[1]

The court therefore concludes that the AHO did not err in determining that A.C. failed to establish a denial of FAPE based on the IEP team's treatment of P.M.'s behavioral interventions and BIP.

### D.    Defendants Do Not Owe Tuition Reimbursement

Finally, A.C. seeks reimbursement for tuition at MAC "from August 22, 2024, through the resolution of this action."  Dkt. No. 1, at PageID.25; Dkt. No. 36, at PageID.1881–82.

When parents believe that a state has failed to provide a FAPE, they may unilaterally enroll the child in a private school and seek reimbursement if the agency "had not made a free appropriate public education available to the child in a timely manner prior to that enrollment."  20 U.S.C. § 1412(a)(10)(C)(ii).  In such circumstances, "Congress meant to include retroactive reimbursement to parents as an available remedy" when a school district fails to satisfy the FAPE requirement.  *Sch. Comm. of*

---

[1]    The AHO noted that A.C.'s argument regarding the alleged absence of sufficient behavioral interventions was not raised in the due process complaint itself.  Under the IDEA, a due process hearing is limited to the issues raised in the complaint unless the opposing party agrees otherwise.  *See* 20 U.S.C. § 1415(f)(3)(B).  The AHO therefore concluded that A.C. could not raise that theory for the first time in the closing brief. Dkt. No. 9-24, at PageID.297.  The court agrees, and that is a separate sufficient reason for rejecting A.C.'s argument.

*Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985); see also *L.B.*, 2026 WL

554455, at *6.

The Supreme Court has made clear, however, that reimbursement is available

only when two conditions are satisfied:  a court must conclude both that the public

placement violated the IDEA and that the parents' private placement was appropriate.

*Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).  This two-step analysis

requires a court to determine whether the school district denied the student a FAPE

before considering whether the parents' private placement was appropriate.  *See id*. at

13–15; *Burlington*, 471 U.S. at 369; *see also L.B.*, 2026 WL 554455, at *7, *9.

Because the court here concludes that P.M. was not denied a FAPE based on the

August 22, 2024 IEP meeting, A.C. cannot satisfy the first step of the reimbursement

analysis.  The court therefore need not reach the second step concerning whether the

parents' private placement at MAC was appropriate.

In addition, the record reflects that P.M. has already received compensatory

education for an earlier period in which the DOE was found to have violated the IDEA.

*See* Dkt. No. 9-24, at PageID.299 (finding that P.M. was awarded compensatory

educational services for the period from July 10 to August 22, 2024); *see also* Dkt. No. 9-

11, at PageID.140.  Compensatory education is an equitable remedy intended to make

up for "educational services the child should have received in the first place" and to

place the child in the position he would have occupied absent the violation.  *R.P. ex rel.*

29

*C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011) (*quoting Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).

Because the court has determined that the DOE did not violate the IDEA with respect to the August 22, 2024, IEP meeting, and because compensatory services have already been awarded for the earlier period in which a violation occurred, A.C. is not entitled to additional equitable relief in the form of tuition reimbursement.

## CONCLUSION

For the foregoing reasons, the AHO's decision is AFFIRMED. The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

DATED: March 24, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge

Civil No. 22-00228 MWJS-WRP; *A.C. v. Department of Education, State of Hawai'i*; ORDER AFFIRMING THE ADMINISTRATIVE HEARINGS OFFICER'S MAY 2, 2025, FINDINGS OF FACT, CONCLUSIONS OF LAW AND DECISION